McCunn, J.
The first question is, whether the penal act of 1857 applies to city railroads incorporated under the general act of 1850, but whose fare for the transportation of passengers was fixed or regulated by contract with the city authorities, who bestowed the grant, and which contract has been confirmed by the legislature of 1854 ?
The act of 1857 refers, by its very terms, only to companies other than city companies.
In Chase v. New York Central Railroad Company (26 N. Y., 526), the court says, that “the statute of 1857 has reference to the statutes in which the rate for carrying passengers is fixed and allowed,” and not to exceed two cents per mile, and that it has no reference whatever to city roads. Indeed, the language of the act shows that it could not have been intended to refer to companies whose fare was fixed at a sum certain for any distance, great or small.
The penalty is prescribed against any company which shall ask and receive a greater rate of fare than that allowed by law, to wit, two cents per mile, and declares that it shall be lawful to take the legal statutory fare for one'mile for any fractional distance less than a mile.
Unless, therefore, the fare of the defendants in the present action is to be governed by the mile, and not by their contract with the city, under which they have always received their fare, but by the general railroad act, it is manifest the act of 1857 has no application.
*359 The act was never intended to apply to a city railroad company, who are carrier of passengers only ; and this is manifest from the language of the statute, which provides that every corporation formed under it shall have power “to regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor ; but such compensation for any passenger and his ordinary baggage shall not exceed three cents per mile.” It would, therefore, be impossible to apply it to a city railroad.
The railroads of the interior have stations at fixed points, from and to which the fare is computable, and at which passengers get in and out of the cars. With our city roads a passenger gets on and off at all points. He pays his six cents, and rides to where he pleases. Moreover, if the act of 1857 had any application to city roads, these defendants may use “steam” (sub. 7, 5, 28), and may demand an extra five cents from passengers not purchasing tickets (§ 87); and the companies are also obliged to erect fences along their entire route (§ 56); and may also take all the real property they require for the purposes of their business (a depot, for instance), and acquire the legal title against the will of the owner (§§ 13, 14, 32). It is clear, therefore, that the general railroad act is not to be stretched beyond its reasonable application. But, in addition to all this, the act of 1854 takes the whole subject of fare out of the. operation of section 28 of the general act.
This act (act of 1854) applies exclusively to city railroads, which commence and end in the city. It authorizes the common council to grant the right to construct and establish railroads upon such terms, conditions and stipulations in relation thereto as such common council may see fit to prescribe. Now, these defendants had been actually incorporated nearly three years at the time of the passage of this act, and had in part constructed their road. They therefore came within its provisions, and by its very terms they were placed in the position in which they would have been, had they obtained their license *360 from the common, council after the passage of the act, and in strict compliance with its terms.
But while the act of 1854 ratified and sanctioned the agreement made "between these defendants and the common council, and thus took the subject of fare out of the general statute of 1850, it did not make the fare fixed by that agreement a matter of statutory enactment—it did not make the fare “allowed by law,” in the language of the penal act of 1857-—it was still a fare regulated by contract. The act confirming the contract says nothing about fare—it leaves that as found and provided for in the resolutions and contract between the city and the company. It made valid, if you please, a voidable contract, and gave legislative sanction to all its provisions, that of fare included.
It follows, from all that has been said, that the fare of these defendants is regulated, not by the act of 1850, as claimed by the complaint in this action, but by the agreement with the city corporation; and it equally follows that the act of 1857 has no application to these defendants. Therefore, the penalties claimed in this action cannot be enforced. There is an exception taken by the defendants to the complaint, in this, that in no count does it allege that the plaintiff informed the conductor, on entering the car, how far he was going, or that he objected to pay the six cents. This exception is well taken, but after what I have said above, it is not necessary to discuss the proposition.
The remaining question, the one submitted without argument, was whether, under the circumstances, these defendants had a right to receive the extra cent from passengers. Compacts, by whomsoever entered into, should be kept; that men and companies are equally bound by such, is self-evident; but it is also evident that if one party performs not his part, the other is released from the performance of his. This is a proposition no being can dispute. Justice, right, and reason require it, and the law of nature commands it.
But extraordinary occasions may now and then occur, *361 in which the happiness of the people may be better promoted by acting for the moment in opposition to the law than in strict observance of it.
Here an occasion did arise—a crisis, it would seem, that could not be avoided. And although the interests of this company were but a mite, as it were, in the great drama enacted, yet they were completely drawn into its vortex, they suffered by its effects, and had to do as all other corporations did in the emergency—sustain themselves as best they could.
The calamities of a civil war broke upon the country; its people and territory were for a time divided; foreign nations looked upon that division as final and permanent, and as for asking credit abroad under the circumstances it was simply preposterous. Something had to be done to save the institutions. A scheme was therefore adopted; and although it upset, in the minds of some, many of the old notions of statesmen and constitutional lawyers, yet it was a complete success ; for it carried a people through the most fearful ordeal that ever a nation was subjected to, without being dependent on any other power for the credit of a single shilling. The measure that benefits most a country, and tends to elevate and make its people great and happy, when it does not invade or encroach on the rights of other nations or other people, will always be deemed constitutional, whether it is in accordance with the written instrument or not; and future ages, viewing it in the light that those means are the most correct which best accomplish the end, will declare it constitutional because of its success.' In other words, I deem that constitutional which benefits the nation, and of which the whole people approve. No law can have much effect which is not backed by the general conscience of the community; and it is for the want of such backing, that fanatical and partisan laws are often disregarded.
•I will say here that the scheme resorted to does credit to the intellect that conceived it, and it does infinite honor to the mass of the people who accepted and were- satisfied *362 with its terms for. the time being, as the only method to save the country from ruin.
At the time this company received its grant, there was nothing but specie received as fare, and it was upon such a basis they obligated themselves to build the road for the accommodation of the public.
In the necessity of the moment, the general government passed laws creating paper currency, the effect of which was to withdraw coin as a circulating medium, and make it an article of merchandise only, and to substitute the created currency; and the five cents which the company charter enabled' them to levy from passengers was enhanced in value to twice that sum in paper. The consequence was, that passengers declined to pay in coin; and this company, when they saw they could not obtain pay in that form, advanced their- demand to six cents in paper.
Mow mark you, this was done, if you please, to save, the company from bankruptcy, but it was also to enable them to run them cars so as to accommodate our rapidly growing community. Under the circumstances, they were justified in the course they pursued.
In the ordinance conferring this grant there is a promise required of the company to carry passengers for a certain price, and tire consideration for that promise was, that the grantees could levy five cents, in coin, from each passenger so carried; and I cannot find, in the papers before me, that they violated that promise by refusing to receive the fare in specie. On the contrary, it is before me that the public, under the pressure of the moment, compelled this company to receive in payment, instead of five cents, in coin, to which they were entitled, a paper currency that was not equivalent at any time to the original fares fixed in their charter.
It is urged that the law of Congress (1864) allowing this company to add the extra cent under the revenue laws, is not constitutional. I do not agree in saying so. Moreover, I hold that companies, under the circumstances, have just as much right to add the extra cent to their fare *363 to enable them to cover the tax imposed by the general government, as the landlord has to raise his rent, or the merchant to increase the price of his commodities for the like purpose. And I will say more, that when we return to a gold and silver basis, and legal minds get running again in the constitutional groove, if the law which creates this paper currency is discussed in connection with that allowing them to charge the extra cent, the one will be found to be equally as constitutional as the other.
These views may not accord with the clamor raised sometimes against railroads or corporations, but the executors of the law should at all times be so far masters of their opinions as not to allow their minds to be warped by every gust of passion which may overbear, for a moment, the reason of the people. I am satisfied, and do maintain, that if Congress had a right to create the currency, and make laws enabling it to pass for money, and that was the cause of depriving the railroads of the five cents in specie, they, in return, had an equal right, under the circumstances, and without the aid of the law of 1864, to require the one cent extra. Hay, more, I hold that in all fairness they have as good a right to exact the full equivalent in paper money for the five cents in coin which their charter guaranteed them, as the general government has to sell gold coin by the million for double its value in greenbacks. I, therefore, cannot join in this hue and cry against railroads, when, perhaps, they are doing all in their power to accommodate our citizens. Certain it is that these companies have added largely to the wealth of our city, by affording its people ready access to all its parts, enabling them to reside on our island, thereby increasing the value of its property. The good done in this way is often forgotten, and our people are frequently misled by designing persons, who carp against corporations from selfish motives.
Now, in this case, T do not intend to. mislead. On the contrary, I shall be plain, so that all can understand ; and that there may be no bickering and breaches of the peace between the employees of companies and the *364 passengers, until this question is disposed of in the court of last resort, I hold—
1st. That when the company secured its charter, it was with the tacit understanding they could charge five cents in specie, that being the currency then.
2nd. That an extraordinary crisis arose, compelling the general government to issue a paper currency, which enhanced the value of the original fare, and that they were justified in advancing one cent when paid in paper.
3rd. That the law of Congress, passed 1865 (13 U. S. Stat. at L., 485), justifies the companies in adding the additional cent to the fares, even if the paper currency had not depreciated the original fare ; and that passengers are bound, if they wish to ride by these cars, to pay-such additional cent.
4th. That the penal act of 1857 does not apply to city railroad companies; and that, by operation of law, the penalty sought for here cannot be recovered.
Judgment must, therefore, be entered for the defendants, overruling the demurrer with costs.